(No. 36220.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ISAAC BURNETT, JR., Plaintiff in Error.

*Opinion filed March 27, 1963.—Rehearing denied May 29, 1963.*

EDWARD J. GRIFFIN, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and EDWARD J. HLADIS and RONALD BUTLER, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE SOLFISBURG delivered the opinion of the court:

Defendant, Isaac Burnett, Jr., was indicted in the criminal court of Cook County for the murder of Katie Hoosman. He pleaded not guilty, was tried by jury, found guilty of murder and sentenced to the penitentiary for life imprisonment. He prosecutes this writ of error from that judgment.

It is defendant's principal contention that the trial court erred in refusing to give manslaughter instructions tendered by defendant. We stated in the recent case of *People* v. *Canada,* 26 Ill.2d 491 : "It is well established that where the evidence in a murder prosecution would permit the jury to find defendant guilty of manslaughter rather than murder, it is reversible error to refuse to give an instruction on manslaughter." On the other hand, if there is no evidence upon which a verdict of manslaughter can be based, such an instruction should not be given. (*People* v. *Tanthorey,* 404 Ill. 520; *People* v. *DeRosa,* 378 Ill. 557; *People* v. *Pokosa,* 342 Ill. 404.) In the final analysis, the question of whether or not the manslaughter instruction should have been given requires a detailed consideration of the evidence.

The undisputed testimony reveals that in December, 1955, the defendant was living in a room in Evanston which he rented from Washington Hoosman, the brother of the decedent, Katie Hoosman. For about a year defendant and Katie Hoosman had been living together in a common-law relationship as man and wife in the Evanston area.

She left the defendant on December 10, 1955, and neither the defendant nor her brother knew her whereabouts.

On December 16, defendant finished work at the Y.M.C.A., where he was employed as chef, about 7:00 o'clock in the evening. He took with him a chef's knife which, according to his testimony, had worn down and which he intended to replace with a new knife he had purchased. On his way home, defendant purchased a half pint of whiskey and arrived at Washington Hoosman's house about 8:00 P.M. Defendant talked with Washington and then went to the home of his father a short distance away. After visiting with his father and sister, defendant returned to Washington's house where he watched television and drank the whiskey he purchased. Defendant then telephoned Onzo Hoosman, another brother of Katie, who lived at the S & S Hotel in Chicago. While defendant and Onzo were talking, Katie appeared in Onzo's room. There was a conversation between Katie and the defendant and the defendant testified that Katie asked him to come and get her. John Asberry, a cab driver and a friend of defendant, was present and agreed to drive the defendant to the S & S Hotel.

On the trip into Chicago defendant purchased a pint of whiskey, part of which he consumed before arriving at the hotel. Upon his arrival there, the defendant kissed and hugged Katie and both appeared to be pleased to see each other. Asberry and the defendant remained at Onzo's for about an hour during which time defendant was drinking and talking with Katie. Sometime after midnight the defendant, Asberry and Katie left to return to Evanston. During the return trip they stopped at a tavern where, according to defendant's testimony, he and Katie each consumed a shot of whiskey and a beer and purchased another half pint. Asberry testified that during the trip back, defendant and Katie were friendly and had no arguments. About 2:00 o'clock in the morning, Asberry

dropped the defendant and Katie at the home of defendant's father in Evanston. They went into the kitchen where they remained until about 3:00 o'clock drinking and talking with the defendant's father. Defendant testified that while they were in the kitchen he removed the chef's knife from his overcoat pocket and placed it on the table. According to his testimony the knife was wrapped in paper and tied with a string. He placed it on the table from where Katie picked it up to carry it home. Olivia Love, the older sister of defendant, testified that she overheard the defendant and Katie come in and that they appeared to be in a pleasant mood. Defendant and Katie then left and took a short cut through the alley to Washington's home.

Defendant testified that as they were walking through the alley, Katie suggested that they go to the North Shore station for coffee, and that he objected because it was too late; whereupon Katie removed the protective paper wrapping from the chef's knife she was carrying and announced that she was going to the station alone and did not want defendant hanging on and if he tried to stop her, she would stick him in the belly. She went to wrench away and lost her balance and both fell to the ground, the knife piercing Katie's throat, killing her. He pulled the knife out, put it in his pocket and walked up to Church Street where he got a cab to a restaurant on Howard Street. From there he called her brother Washington and told him he thought Katie was dead and he would be there shortly. Henry Malcomb testified in rebuttal that the defendant came to his house in the early morning hours on December 17, 1955, and showed him a knife and said, "This is what I did it with." From Malcomb's home he called his "brother-in-law" Washington again.

Defendant further testified that he then bought a drink at a tavern and got on a streetcar and fell asleep. When he awoke, he got off, purchased another half pint of whiskey

and returned to his father's home about 7:00 A.M. and met the police. He showed officers Dorband and Caulderwood of the Evanston police department the knife and proceeded to drink the whiskey. While he was breakfasting, the officers asked him where it happened and why he did it and he replied that he had nothing more to say and there was no further conversation about the killing. He took them to the place of the killing on the way to the police station.

Sergeant Dorband testified that in answer to a call he went to the alley in question about 4:20 in the morning of December 17, 1955, and discovered Katie Hoosman's body with a large hole below the left ear. About 7:15 A.M. he and Captain Caulderwood went to the home of defendant's father and several minutes later the defendant arrived. They asked him for his gun but instead the defendant produced a knife. Dorband testified that the defendant stated that he had killed his wife because she wouldn't stay home; she had left him and he got fed up with everything. The police officers permitted the defendant to eat breakfast and then went with him to the place where the body had been found. They testified that defendant said he and Katie had been arguing about her leaving him as they walked down the alley and Katie had laid down beside the fence and defendant pulled out the knife. Katie asked defendant if he was going to kill her and defendant said "Yes." Katie told him he would go to hell and defendant replied that he would see her there. Katie then got up and defendant asked her if she was going to fight and then plunged the knife into the left side of her neck. Captain Caulderwood's testimony was essentially the same as Sergeant Dorband's. He also stated that the defendant said he had taken the knife from the Y.M.C.A. to sharpen it, but didn't know why he had not left it at home.

William Walls, an Evanston police officer, also testified

in rebuttal that he was present in a police car when defendant stated to Caulderwood and Dorband that he had done it because Katie would not stay home and that he had held the knife in his right hand.

Olivia Love, defendant's sister, was present at the time defendant returned to his father's home at 7:00 o'clock in the morning. She testified that the defendant's eyes were bloodshot and his appearance very "rugged". She was present during part of defendant's conversation with the police and heard him say that there was no gun and that the knife was what they wanted.

James Love, defendant's brother-in-law, was present during the entire time defendant talked to police officers in the kitchen and heard the defendant state that he had no gun, that a knife was what they wanted. He further testified that defendant had not stated to the police what had happened and had told them only that it would come out in the trial.

On the basis of this evidence, the trial court instructed the jury on murder, accident and misadventure, but refused to instruct the jury on manslaughter.

Murder is defined by statute as "the unlawful killing of a human being * * * with malice aforethought, either express or implied." (Ill. Rev. Stat. 1955, chap. 38, par. 358.) Manslaughter is defined as "the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible, or involuntary in the commission of an unlawful act, or a lawful act without due caution or circumspection." Ill. Rev. Stat. 1955, chap. 38, par. 361.

From an examination of the record it is clear that the People proceeded on the theory that defendant was guilty of murder. On the other hand, defendant's theory was that

decedent met her death as a result of accident or misadventure. It is our opinion that the jury was properly instructed on both theories.

On this appeal, however, defendant apparently argues that the evidence of the harmonious relationship between Katie and defendant, and the evidence of drinking was sufficient to rebut the inference of malice. With this we cannot agree. If defendant's evidence is believed, the decedent's death was accidental. On the other hand, if People's evidence is believed, defendant admitted the slaying under circumstances that clearly implied malice. As we said in *People* v. *Jordan,* 18 Ill.2d 489, "It is not necessary to justify a conviction of murder that one shall have deliberately formed an intent to kill. It is sufficient if at the instant of the assault, he is actuated by that wanton and reckless disregard for human life that denotes malice." If it were true that defendant killed Katie because she was going to leave him, such a fact could not be considered a "highly provoking injury," "sufficient to excite an irresistible passion in a reasonable person."

The evidence of defendant's drinking also falls far short of showing that he was so intoxicated as to suspend his powers of reason so as to justify a manslaughter verdict. (*People* v. *Tanthorey,* 404 Ill. 520, 531.) We, therefore, conclude that the trial court properly refused the tendered instructions on manslaughter.

Defendant next contends that the inflammatory remarks of the prosecutor constituted reversible error. Early in the trial the assistant State's Attorney stated that he anticipated a little difficulty with defense counsel and wished to have an agreement that there would be no speeches. An objection to this remark was immediately sustained and although it was improper and undignified, we cannot believe that it could have caused any prejudice in the minds of the jury. During his final argument the assistant State's Attorney suggested that the testimony was that the deceased's throat

was slit practically from ear to ear. He further told the jury that "if you loved a dog, you would not leave a dog die like that"; that "there has never been a murderer in Cook County proven more clearly guilty"; and that "this was the most horrible, the most violent, the most aggravated type of murder. Isaac Burnett deserves what he gave Katie Hoosman." In conclusion the assistant State's Attorney stated that the deceased had a right to her life and further stated "She lies cold in her grave. All she can do, we must do for her." These remarks are subject to criticism, in part, as being the personal opinion of the prosecutor, but as we said in *People* v. *Miller,* 13 Ill.2d 84, 109: "Statements of counsel and argument based upon facts and circumstances proved, or upon legitimate inference therefrom, do not exceed the bounds of proper debate and are not to be discountenanced by the courts. [Citation.] It is not improper for the prosecuting attorney to reflect unfavorably on the defendant, or to comment on his actions, if based upon competent and pertinent evidence. [Citations.] Similarly, the State's Attorney has a right to dwell on the evil results of crime and to urge fearless administration of the law. [Citation.] On the basis of these decisions, we cannot say that the prosecutor's statements drawn from facts in evidence, or his reference to his responsibilities and duty, transcended legitimate argument."

Reading the entire argument we cannot say that the statements and characterizations of the prosecutor are totally without basis in the record. The People's theory of the case, supported by the evidence, indicates a vicious murder. While we do not condone some of the remarks made, we do not believe that they deprived the defendant of a fair trial.

Another series of remarks made by the assistant State's Attorney have been repeatedly criticized by this court— stating in part: "Of course, counsel in an attempt to throw up a smoke screen to fool the jury * * * There is

nothing, there is no law of the court, there is no law known to man that crowns with glory the successful effort of a defense attorney to fool a jury and turn loose a cold blooded murderer upon the streets. You have not only a responsibility to a defendant charged with murder, you have a responsibility to see that justice is realized."

We cannot condone these personal attacks upon defense counsel and consider them unprofessional and highly improper. Nevertheless, we conclude from the entire record and the entire argument of counsel that they were not of such magnitude in this case as to justify a reversal of the judgment of the trial court.

The defendant's last contention is that the trial court abused its discretion by permitting the People to introduce the testimony of witnesses Walls and Malcomb in rebuttal. We have examined the record and find that the testimony of both witnesses was only corroborative of the case in chief and was apparently contradictory of defendant's evidence and was, therefore, properly admitted in rebuttal. *People* v. *Griswold,* 405 Ill. 433.

We, therefore, conclude that the defendant was proved guilty of the crime of murder beyond a reasonable doubt, that he was given a fair trial, and that no error intervened sufficient to justify a new trial. The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*