THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FAUSTO VILLAREAL *et al.*, Defendants-Appellants.

First District (6th Division)   Nos. 1—88—1699, 1—88—1700 cons.

Opinion filed June 29, 1990.

John M. Kalnins, of Chicago, for appellant Fausto Villareal.

Kenneth N. Flaxman, of Chicago, for appellant Jesus Contra.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Elizabeth A. Sklarsky, and Michael J. Drake, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendants, Fausto Villareal and Jesus Contra, were each convicted by a jury of the offense of aggravated battery of a police officer, and subsequently were sentenced to 30 months' probation. Villareal and Contra are brothers. In their consolidated appeal, defendants urge this court to reverse their convictions for the following reasons: The State failed to prove them guilty beyond a reasonable doubt; the trial court erred in denying defendants' motion for a new trial based on newly discovered evidence; the trial court erred in the giving and

refusal of certain instructions to the jury; the trial court improperly failed to declare a mistrial when the jury was unable to reach a verdict after its second day of deliberations; and the trial court erred in denying defendants' motion for a new trial based on the State's alleged abuse of subpoena.

The incident leading to defendants' arrests began with a telephone call to the police by a neighbor, Vanessa Orr, who had heard some gunshots fired next door. It culminated in defendants' brother, Jose Villareal, being shot and killed by the police.

Officer Israel Pacheco testified that he and his partner, Joseph O'Connor, responded to the call to go to 1735 North Menard on September 27, 1986, at about 11:40 p.m. The officers approached in an unmarked vehicle but had its oscillating flashing headlights in operation. Pacheco was wearing a blue Bears tee shirt, jeans and gym shoes. His tee shirt was tucked into his jeans. O'Connor was wearing a short-sleeve shirt, tucked in, jeans and gym shoes. Each officer had a belt which held ammunition pouches, revolvers, handcuffs, a radio holder, and a police badge. Pacheco was holding his flashlight and his radio.

As Pacheco began speaking with Orr, the person who had reported hearing gunshots, they both saw a man, later identified as the deceased, come to the window at 1733 North Menard. When Pacheco flashed his light, the man jumped back from the window.

Pacheco then heard two gunshots. Shoving Orr back into her apartment, Pacheco proceeded to 1733 Menard. After Pacheco identified himself as a police officer, he and O'Connor apprehended two men standing in the vestibule. At this point, a door opened and Pacheco saw several women in an apartment. The deceased came to the doorway and reached into his pocket. Pacheco again announced his office and pushed the deceased back into the apartment. When the deceased came at him again, Pacheco pinned him against the wall. The deceased pushed away from him and went into the dining room.

Pacheco saw the deceased grab a woman, put her in front of him, and pull out a gun. Pacheco again identified himself and ordered the deceased to drop the gun. At that time, Pacheco felt someone punch him from the right side. The deceased was holding the gun with both hands, and Pacheco saw his finger jerk. Pacheco fired his service revolver at the deceased. When Pacheco saw the deceased's finger jerk again, Pacheco fired his gun a second time.

Pacheco stated that he began falling and felt someone on his back, kicking him. An individual was standing over him, and Pacheco fired twice in that direction. While defendants attacked him, Pacheco heard

more gunshots, apparently fired by O'Connor. One of the two men tried to grab his gun, and Pacheco reached out to get the gun back. As he did so, he was being kicked and punched. Pacheco testified that during the struggle for the service revolver, he was able to save his life by holding the cylinder of the gun, causing it to misfire. (We will refer to Pacheco's testimony regarding the misfiring in more depth during our analysis.)

Officer O'Connor, who had entered the building with Pacheco, heard the scuffle and gunshots, and he and Officer McNicholas attempted to locate Pacheco. Both officers heard someone shouting "Police." O'Connor looked into a door leading into a dining room and observed Pacheco struggling with someone. Someone in the apartment saw O'Connor and slammed the door into him. McNicholas also was able to see into the dining room and observed Pacheco with two male Hispanics on top of him. It appeared that Pacheco was wrestling with the men.

O'Connor gained access to the dining room. He observed Pacheco on his back, with both defendants punching him. O'Connor observed the deceased in the middle of the room standing in a combat-style stance with both hands on a gun, pointing it at Pacheco. O'Connor raised his gun and fired eight shots at the deceased. O'Connor stopped firing when the deceased dropped the gun and fell to a chair.

O'Connor then pulled one of the men off Pacheco. Villareal jumped up and Pacheco followed suit. Villareal came at Pacheco, and Pacheco hit him with the gun. Pacheco handcuffed Contra, and O'Connor and McNicholas handcuffed Villareal. McNicholas looked for other occupants of the apartment and observed 15 or 20 men running towards the dining room. Two or three of them reached into the inside of their coats. He announced several times that he was a police officer. The men halted and exited out the back doorway. None of these men was arrested.

Pacheco testified that the next day, he was able to see the extent of his injuries. He had bruises all over his body. His neck was scratched up, and he had black and blue marks all over his shoulders and face. He also had a cut on his face. Pacheco stated that the injuries which he received occurred after he fired at the deceased.

Villareal testified for the defense that he was in the room when Pacheco entered. A birthday party was in progress. He stated that Pacheco did not identify himself as a police officer. Villareal did not think that Pacheco was a police officer because he was dressed in ordinary clothes. Villareal stated that as Pacheco entered the dining room, he met Villareal with a gun, which he placed on Villareal's

chest. Pacheco told him to raise his hands and threatened to shoot him if he did not do so. Villareal complied with the man's demand. At that time, there were several people in the room, including Villareal's brothers, the deceased and Contra. (Villareal and Contra are brothers.) The deceased's widow, Villareal's wife, and some children were also present.

Villareal testified that Pacheco approached the deceased and told him to put his hands up. When the deceased asked Pacheco to identify himself, Pacheco swore and told him to shut up. The deceased swore back, and Pacheco shot the deceased twice. Villareal did not see anyone touch Pacheco before he shot the deceased.

After Pacheco shot the deceased, Villareal grabbed Pacheco's gun to protect himself. As Villareal did so, someone hit him from behind and he fell down. Villareal yelled at him, and Pacheco shot at Villareal, missing him. He heard more shots being fired. Villareal stated that he never touched Pacheco, but only grabbed his gun. Villareal also stated that he and Contra were beaten up prior to being taken to the police station.

Quintia Villareal, the deceased's wife, corroborated Villareal's testimony. She added that when she saw her husband fall, she attempted to go to him but was restrained by Pacheco. When Pacheco restrained her, she scratched him in the face. Quintia acknowledged that she had a lawsuit related to this incident pending against the City of Chicago and the Chicago police department.

Emelda Villareal, the deceased's 12-year-old daughter, testified to the same series of events to which her mother had testified. She added that after her father was shot, her mother sent her to one of the bedrooms.

Julien Gallet, the deputy chief of detectives, testified for the defense and stated that when questioned, Pacheco never said anything about how his gun had been turned on him and clicked and misfired.

Officer Hector Valdes testified for the State both during its case in chief and in rebuttal that he interviewed several of the people involved. Quintia told him that one of the men who entered the apartment asked her if her husband had a gun. As she stated that he did not, one of her brothers-in-law jumped on the man. The man shot at her husband, and she was pushed to the ground. Emelda told Valdes that when the men entered the apartment, her mother instructed her to go into the bedroom. One of her aunts closed the door to the bedroom. A few minutes later, she heard shots. She stated that she did not see any of the shots being fired.

In an interview with Villareal, Valdes was told that Villareal

drank a large amount of beer at the party. Villareal also told Valdes that he knew the individual who came into the apartment that evening was a police officer. Villareal said he knew this immediately upon the man's arrival.

After hearing evidence and arguments, the jury was instructed as to the law. Following three days of deliberations, the jury returned its verdict of guilty as to both defendants. The trial court denied defendants' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

On appeal, we initially address defendants' challenge of the trial court's ruling on their post-trial motions. In the motions, defendants sought a new trial based on newly discovered evidence concerning Pacheco's revolver.

At trial, Pacheco testified that the "dimple" mark on his revolver had been made during the struggle for the revolver. Pacheco stated that during the struggle, one of the defendants attempted to fire the revolver at him, but that he was able to save his life by holding the cylinder of the gun, causing it to misfire. He stated that he saw the hammer go back and hit and strike the cylinder. Pacheco was able to hold the cylinder to prevent the hammer from striking and discharging the bullet. Pacheco's revolver had been returned to him after this incident and he was permitted, over defense objection, to show the jury a "dimple" mark on the gun cylinder. Pacheco asserted that the mark had been made during the struggle. He also stated that he noticed the mark when the gun was returned to him. The revolver was received in evidence, and when, in the second day of deliberations, the jury asked to see the revolver, it was sent back to the jury. (No report or statement by Pacheco or any of the officers mentioned this misfiring incident prior to Pacheco's testimony.)

In their post-trial motions, defendants stated that they learned after trial that the mark on the cylinder of Pacheco's weapon was made during manufacture of the gun and could not have been made during a struggle. Defendants stated that scientific evidence demonstrated that Pacheco had testified falsely and that they were entitled to a new trial. In their motions for a new trial, defendants attached the affidavit of Burt C. Nielson, a firearms consultant and former assistant chief firearms examiner of the Chicago police crime laboratory, who stated that he examined the revolver and immediately knew that the mark was part of the manufacturing process. Nielson's affidavit stated in part:

"10. I inspected the rear face of the cylinder and found a factory applied dimple on the opposite edge of the rim from the

'S' mark. The 'S' mark between the chambers on the rim of the cylinder is a factory proof mark showing that the cylinder had been tested with hot loads. The dimple indicates that the cylinder had been magnafluxed (subjected to magnetic particle inspection) at the factory. I observed another magnaflux dimple approximately one-quarter of an inch forward of the frame on the left side of the barrel in the ejector rod shroud.

\* \* \*

12. The construction of the .357 Luger double action revolver makes it impossible for the firing pin to strike the cylinder other than the primer of a center fired cartridge. This is because of a part of the firearm known as the 'transfer' bar which transfers energy from the hammer to the firing pin. Because of the way in which the firearm is constructed, the transfer bar will not be in a position between the hammer and the firing pin unless the cylinder had been rotated and locked into position, with a cartridge directly under the firing pin."

Nielson concluded that it was not possible for the firing pin to have struck any part of the rear of the cylinder in the type of gun used by Pacheco.

The trial court denied defendants' motions for a new trial and placed both men on probation.

■■ To warrant a new trial, the new evidence must be of such a conclusive character that it likely will change the result on retrial. Moreover, the evidence must be material to the issue but not merely cumulative, and it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence. (*People v. Molstad* (1984), 101 Ill. 2d 128, 461 N.E.2d 398; *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.) A motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial court and denial thereof will not be disturbed in the absence of a showing of an abuse of discretion. (*People v. Baker*, 16 Ill. 2d 364, 158 N.E.2d 1.) We find that here, the trial court abused its discretion. Each part of the test has been satisfied and a new trial is required.

First, the new evidence here is of such a conclusive character that it likely will change the result on retrial. It was Pacheco's testimony that he followed the deceased into the dining room; that deceased drew a gun and pointed it at him; that somebody slapped and punched him; that he drew his revolver and fired at the deceased; and that he then was attacked and injured by defendants. Pacheco testified in detail about his struggle with defendants. He narrated with specificity

how he observed the gun hammer go back and hit and strike the cylinder, and how he was able to hold the cylinder to prevent the hammer from striking and discharging the bullet. Pacheco claimed that this action saved his life. The new evidence would tend to establish that Pacheco's recitation of this series of events was false. Thus, the new evidence could operate to cast doubt on Pacheco's testimony as a whole.

At the time the struggle began, no officer except Pacheco was in the dining room. Thus, the State's case regarding that struggle depended in large part upon Pacheco's testimony. In view of the fact that the new evidence could establish that at least a portion of that testimony was false, we believe that outcome of the trial likely would change on retrial.

Moreover, we find that the evidence is material to the issue at trial, and not merely cumulative. As noted above, the crucial issue at trial was whether defendants attacked Pacheco and attempted not only to wrestle the gun away from him, but to shoot him. According to Pacheco the only reason he was not shot was that due to his efforts the gun misfired. Evidence that the gun could not have misfired certainly is material to a resolution of this issue. Significantly, we note that the jury was given the opportunity to examine the gun during the course of the trial. The jury also requested to see the gun during deliberations. We conclude, therefore, that the jury found the gun testimony important to resolution of the case.

Finally, the evidence was discovered after trial and could not have been discovered prior to trial by the exercise of due diligence. Defendants had no prior knowledge that Pacheco would testify he was able to save his life by holding the cylinder of the gun, causing it to misfire, as demonstrated by the dimple mark on the cylinder. Defendants were not on notice that the gun would be used at trial in such a way and, therefore, could not be expected to seek to examine the gun prior to trial.

We conclude that the trial court abused its discretion in denying defendants' motion for a new trial. We therefore reverse defendants' convictions and remand for a new trial.

■ Because we reverse the convictions for trial error, we must decide whether the evidence at the first trial was sufficient to sustain the conviction. (*People v. Brooks* (1987), 115 Ill. 2d 510, 505 N.E.2d 336; *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366; *People v. Avery* (1989), 180 Ill. App. 3d 146, 534 N.E.2d 1296.) Double jeopardy is not a bar where, as here, reversal is the result of trial error. *Burks v. United States* (1978), 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141;

*People v. Stofer* (1989), 180 Ill. App. 3d 158, 534 N.E.2d 1287.

A reversal based on certain trial errors implies nothing with respect to a defendant's guilt, but merely determines that he was convicted through a judicial process which is defective in some fundamental respect. (*Lockhart v. Nelson* (1988), 488 U.S. 33, 102 L. Ed. 2d 265, 109 S. Ct. 285; *People v. Taylor*, 76 Ill. 2d 289, 391 N.E.2d 366; *People v. Avery*, 180 Ill. App. 3d 146, 534 N.E.2d 1296.) All evidence submitted at the original trial may be considered in determining the sufficiency question for double jeopardy purposes. *Lockhart v. Nelson*, 488 U.S. 33, 102 L. Ed. 2d 265, 109 S. Ct. 285; *People v. Stofer*, 180 Ill. App. 3d 158, 534 N.E.2d 1287.

■ In view of all of the competent evidence presented at trial, we find there is sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that defendants were guilty of aggravated battery. There was evidence that defendants caused bodily harm to Pacheco and that defendants knew Pacheco was a police officer. Both O'Connor and McNicholas testified that they announced their office upon entry into the apartment. Moreover, O'Connor testified that he heard Pacheco announce his office as he proceeded through the apartment. Additionally, Orr testified that Pacheco had a flashlight, a badge, a walkie-talkie, and a gun, all indicia of his office. There was also evidence from Valdes that Villareal told him he knew the men who entered the apartment were police officers. We believe the evidence is sufficient to permit a jury to find defendants guilty beyond a reasonable doubt.

In light of our holdings, we need not decide the issue of the State's alleged abuse of subpoena or the issue of the trial court's alleged error in denying defendants' motion for a mistrial after the jury failed to return a verdict after two days of deliberation. We also hold that the trial court properly instructed the jury.

For the foregoing reasons, the judgments of the circuit court of Cook County are reversed, and the matters are remanded for a new trial.

Judgments reversed and remanded.

EGAN and RAKOWSKI, JJ., concur.