THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL WILLIAMS, Defendant-Appellant.

First District (2nd Division)   No. 1—96—2496

Opinion filed March 3, 1998.

RAKOWSKI, J., specially concurring.

Barry Levenstam and Rachelle M. Niedzwiecki, both of Jenner & Block, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Lisa D. Kurtzon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:
Defendant, Michael Williams, and codefendant, Buford Hodby,

were convicted of first-degree murder in simultaneous jury trials for the shooting death of a rival gang member. On appeal, defendant seeks a new trial on the grounds that: (1) the trial court abused its discretion in denying defendant's motion for a new trial when newly discovered evidence exculpated defendant and inculpated two other individuals; (2) the trial court committed plain error by failing to inquire during *voir dire* if the potential jurors would be prejudiced by knowledge that defendant was a gang member; (3) the State's closing argument was improper, inflammatory, and included evidence not presented at trial; and (4) defendant was denied his right to effective assistance of counsel because his attorney failed to tender questions to the trial court during *voir dire* regarding juror bias toward gangs and failed to object to the State's improper closing argument.

We affirm.

## BACKGROUND

On the night of August 27, 1994, into the early morning of August 28, Turonica Williams (a friend and no relation to defendant) held a birthday party at her home in Chicago. The neighborhood surrounding her home is primarily residential and is recognized as an area in which several gangs are active. The party was attended almost exclusively by members of neighborhood gangs, including the Titanic Black P-Stones (TBPS) and its rival gangs, the Conservative Vice Lords (CVL) and the Renegade Vice Lords. During the party, a member of TBPS and a member of CVL bumped into each other inside the house and exchanged words. Two or more CVL members then left the party, stating something to the effect, "we'll be back." Shortly thereafter, between two and four people dressed in black arrived at the area outside the party and began firing guns. Fifteen-year-old Raymond Malone, an alleged TBPS member who was sitting on a car with other TBPS members, was fatally shot. After the shooters fled the scene, two TBPS members took Malone to a hospital, where he was pronounced dead as a result of a gunshot wound to the chest. Williams and Hodby were indicted for Malone's murder, and the matter proceeded to simultaneous jury trials.

At trial, eight witnesses testified on behalf of the State. Four of those eight were eyewitnesses to the shooting incident and three of those four eyewitnesses were members of TBPS. The first eyewitness to testify was Scott Tyler, who stated that he attended the birthday party at 1 a.m. on August 28, 1994, along with his girlfriend, who was Raymond Malone's sister. Tyler testified that, while standing near the car on which Malone and others were sitting, he saw four people emerge from a nearby alley and start shooting. He stated that,

although the lighting was dark, he identified Williams and Hodby as two of the gunmen. Tyler then stated that the shooters subsequently ran back into the alley from which they came. He later accompanied others to the hospital where Malone was taken. At the hospital, he spoke with police about the incident. He continued to discuss the matter with police back at the scene of the crime, but he never identified Williams as a shooter during those conversations with police. Tyler later identified Williams as one of the shooters at a police lineup and testified that his initial reservations were caused by his concern for relatives that lived in the area, which he feared was plagued by the CVL.

Next, the State called Demetrius Adams, a TBPS member who also witnessed the shooting. Adams testified that he saw the bumping incident that occurred indoors between the TBPS and CVL gang members. He stated that neither Williams nor Hodby was a party to that altercation. Adams testified that, later that night, he was with Malone and others near a parked car when Williams and Hodby came out of the alley and began to shoot at TBPS members. After the shooting, Adams helped take Malone to the hospital. Adams remained at the hospital only momentarily, however, and gathered a small group of people to search for Williams and Hodby to no avail.

Another TBPS member, Henry Golden, also testified that, while sitting on the hood of his car with Malone and Adams, he heard gunshots coming from the nearby alley. He stated that he saw Williams and Hodby firing at them and pushed Malone down. When he saw that Malone was shot, he summoned others for assistance and helped take the victim to the hospital. Golden testified that, immediately thereafter, he, Adams, and another TBPS member got their guns and searched for Williams and Hodby. He stated that the search was made with the intention of killing Williams and Hodby if they were found.

TBPS member Gregory Spence arrived at the party at approximately 11:45 p.m. and remained outside due to the overcrowding indoors. He testified that he witnessed Williams and Hodby, along with two other males, leave the party. Spence stated that, approximately 30 minutes later, he heard gunshots and saw two people firing guns. He testified that he was not "100% sure" that Williams was a shooter, but he stated that one shooter had the same height, weight, and clothing as Williams. Spence later identified Williams as one of the gunmen at a police lineup.

Diana McGhee, defendant's girlfriend and mother of his children, was the sole witness called to testify on behalf of defendant. She testified that, at approximately 11:30 p.m. on the night of the party,

defendant came to her home. She stated that, at approximately 12:30 a.m., Williams received three to four telephone calls on his pager and that he returned at least one of those calls while at her house. McGhee testified that she did not know with whom Williams spoke on the telephone, and she said that, following his conversation, Williams proceeded to leave the house sometime after 1 a.m. She asked him what had happened, and Williams replied that there had been a shooting.

In January 1996, the jury found Williams guilty of first-degree murder. Defendant then filed a motion for a new trial arguing that the State failed in its burden to prove defendant guilty beyond a reasonable doubt and that newly discovered evidence warranted a new trial.

In May 1996, the trial court conducted a hearing and heard argument on Williams' and Hodby's separate posttrial motions. Defendants presented five witnesses at that hearing.

First, Jerome Hunt, defendant's fellow CVL member, testified that he had attended the party and witnessed the indoor incident between his gang and the TBPS. Hunt stated that two unidentified people left the party, stating that they would "be back." Hunt also testified that neither defendant was present during that incident and that he believed that they had left the party before the two unidentified men stated that they would return. Hunt stated that, when the shooting began, he was standing in front of the house from where he saw shots come from the alley. He testified that he saw one of the shooters turn around and that he only made out the gunman's shadow as he ran back towards the alley. Although he was approximately one-quarter of a block away from the figure he saw, Hunt stated that the gunman was "husky," about 190 pounds, and 5 feet 11 inches tall. He testified that he had known Williams for nearly six years and that he was positive that Williams was not the same body type as the shooter. Hunt also testified that he had not come forward sooner for fear of gang retaliation. On cross-examination, the State questioned Hunt about a statement in his own affidavit in which he positively identified two men other than defendants who were involved in the bumping incident and who left the party promising to return. Hunt testified that the statement in the affidavit was not his own and maintained that he could not identify the two men in that incident.

Next, Turonica Williams, who hosted the party on the night of the shooting, testified that she observed the bumping incident in her living room. She stated that defendants were not a part of that altercation and identified the two individuals involved as Ed Young of TBPS and "Prune" of CVL. Ms. Williams stated that it was CVL

member Dorian Jefferson who stated, "we'll be back," and that he and CVL member Charles McDavid then left the party together. Ms. Williams also testified that approximately one hour after the bumping incident, she saw a tall, dark-skinned man about 6 feet tall and weighing about 185 pounds emerge from a nearby alley. She stated that this person was about 10 feet from her at the time and that he was alone. Ms. Williams testified that the gunman she saw fit Charles McDavid's physical description and that she was absolutely certain that the shooter she saw was not defendant. She also stated that, after the shooting, she received threats and learned that defendant's brother's house had been burned down. Ms. Williams testified that she became fearful for her life and moved out of her neighborhood within weeks. She further testified that it was this fear that kept her from coming forward with her information earlier. Prior to her testimony, Ms. Williams did tell the police that defendant did not commit the shooting and that McDavid was the gunman.

Defendant's brother, Levelle Williams, who was a top-ranking member of TBPS, also testified at defendant's posttrial hearing. He testified that, during defendant's trial, he spoke with Scott Tyler and fellow TBPS members Henry Golden and Gregory Spence outside the courtroom and that Golden and Spence discussed how they planned to testify during the trial. Levelle Williams stated that Golden admitted that he was uncertain that defendant committed the shooting but that he wanted to get even with the CVL.

Next, Lamar Williams testified on behalf of defendant. He is the brother of defendant and Levelle Williams and testified that he was not at the party during the shooting but was sitting on the front porch of his house. He stated that, sometime after midnight, codefendant and CVL member Hodby came to his house, followed by TBPS members Henry Golden and Ed Young. Lamar Williams testified that Young and Golden arrived with news that one of their friends had been shot and that someone would have to do the time for it. Lamar Williams further testified that Golden saw Hodby at Lamar Williams' house at that time but took no action regarding Hodby. He further explained that the reason why he failed to reveal this information before the posttrial hearing was that his house had been burned down and he was concerned about the well-being of his family. On cross-examination, Lamar Williams was impeached by his prior inconsistent statement regarding his whereabouts on the night of the party. In a prior statement during direct examination, Lamar Williams had stated that codefendant Hodby had been at his home for approximately 30 minutes when Ed Young and Henry Golden arrived with news that their friend had been shot. Lamar Williams then

testified during cross-examination that he had visited Turonica Williams' house but that he returned home to drink with friends before her party began. He testified that, during a subsequent trip to a store to get more liquor, a TBPS member jumped on top of his car exclaiming that someone had been shot.

Finally, Ed Young testified at the hearing that he was a general in the TBPS and that he was one of the people involved in the bumping incident. He stated that, at the time of the altercation with a CVL member, defendants were outside the house. Young testified that he was in front of the house when gunshots were fired and that, based on the "stocky" physique of the two distant figures he observed, neither defendant could have been a gunman. He admitted, however, that he did not see the shooters' faces.

At the conclusion of the hearing, the trial court denied defendant's motion for a new trial based on newly discovered evidence and thereafter sentenced defendant to 40 years' imprisonment.

ANALYSIS

I

Defendant first contends that the trial court erred in denying his motion for a new trial based upon newly discovered evidence. Defendant argues that the five witnesses who testified at the posttrial hearing presented evidence that conclusively exculpates defendant and inculpates other individuals. The State, however, contends that the new witnesses' testimony was vague and impeached and could have been discovered prior to trial by the exercise of due diligence.

In Illinois, newly discovered evidence warrants a new trial when: (1) it has been discovered since the trial; (2) it is of such a character that it could not have been discovered prior to the trial by the exercise of due diligence; (3) it is material to the issue but not merely cumulative; and (4) it is of such a conclusive character that it will probably change the result on retrial. *People v. Molstad*, 101 Ill. 2d 128, 134 (1984), quoting *People v. Baker*, 16 Ill. 2d 364, 374 (1959); *People v. Kolb*, 273 Ill. App. 3d 485, 489, 653 N.E.2d 39, 41 (1995); *People v. Cunningham*, 267 Ill. App. 3d 1009, 1017, 642 N.E.2d 781, 786-87 (1994). Motions for new trial on grounds of newly discovered evidence are not looked upon favorably by the courts and should be subject to the closest scrutiny. *People v. Cooper*, 164 Ill. App. 3d 734, 741, 518 N.E.2d 260, 265 (1987). Moreover, the denial of a motion for a new trial based on newly discovered evidence will not be disturbed on appeal absent an abuse of discretion. *Kolb*, 273 Ill. App. 3d at 489, 653 N.E.2d at 41.

■ In the case *sub judice*, the trial court's denial of defendant's motion for a new trial was based on several factors. The trial court found Jerome Hunt's testimony regarding his observations and description of the shooters to be incredible and entirely suspect, as it was based on Hunt's perception of vague and distant figures. The trial court was even less persuaded by Turonica Williams' testimony, which the court found to be replete with contradictions when considered against her previous statements to police. The trial court made no detailed findings with respect to the testimony of Levelle Williams. However, the court did find the testimony of defendant's other brother, Lamar Williams, to be unbelievable based on his courtroom demeanor, which the trial court stated included smirking and smiling. The court also found that the testimony of Ed Young, like that of nearly all of defendant's witnesses, could have been presented at trial with the exercise of due diligence. The court was equally unimpressed by the witnesses' claims that their delay was due to fear of gang retaliation. The court found that such claims lacked credibility and that the witnesses were more likely motivated to testify at that point because defendant had been found guilty. While the trial court did find that the witnesses' testimony was material to the critical issue of identification, it concluded that, based on the foregoing findings and reasons and the suspicious timing of their testimony, that evidence would not change the outcome of the trial and was, therefore, insufficient to justify a new trial based on newly discovered evidence.

On appeal, defendant nevertheless relies on *Molstad* and *People v. Villareal*, 201 Ill. App. 3d 223, 559 N.E.2d 77 (1990), to establish that the testimony of the witnesses at his posttrial hearing should be considered to be newly discovered. In *Molstad*, the Illinois Supreme Court granted a new trial based on the newly discovered evidence of affidavits executed by the codefendants of the defendant. In that case, following a guilty verdict but prior to the sentencing of four convicted defendants, defense counsel offered affidavits of four convicted codefendants and one acquitted codefendant that stated that the defendant had not been present at the scene of the crime. The supreme court concluded that those affidavits would create new issues to be considered by the trier of fact. *Molstad*, 101 Ill. 2d at 135. The court reasoned that the evidence in that case likely would have produced a different result, because the testimony of the sole prosecution witness placing the defendant at the scene of the crime would have to have been weighed against the defendant's own corroborated alibi testimony as well as the testimony of the five codefendants. *Molstad*, 101 Ill. 2d at 135-36. The court further held

that the new affidavits could not have been discovered with the exercise of due diligence, since "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination [citation] if the codefendants did not choose to do so." *Molstad*, 101 Ill. 2d at 135.

In *Villareal*, the newly discovered evidence at issue consisted of the testimony of a firearms expert. At the defendant's trial for aggravated battery of a police officer, the officer testified that, during a struggle for his gun, the officer held the gun's cylinder, causing it to misfire. The officer believed that this misfiring saved his life, and he attributed this fortunate malfunction to a dimple mark that he caused when holding the gun during his struggle with the defendant. The officer's testimony was the first time that the misfiring incident had been raised in the case. The firearms expert later stated, however, that the dimple mark had actually been caused during the gun's manufacture and could not possibly have been created in the manner that the officer had testified. The appellate court in *Villareal* held that this newly discovered evidence could not have been revealed prior to trial by due diligence, since the officer's evidence of misfire had been introduced for the first time at trial. *Villareal*, 201 Ill. App. 3d at 230, 559 N.E.2d at 82. The court further held that, because the State's case rested mainly on the officer's testimony and the firearms expert's testimony so contradicted the officer's accounting of events, the new evidence was likely to change the result of the trial. *Villareal*, 201 Ill. App. 3d at 229-30, 559 N.E.2d at 81-82.

We believe *Molstad* and *Villareal* to be inapposite to the instant case. In those cases, facts showing that the newly discovered evidence could not have been previously revealed through due diligence were more compelling than the facts before us. We agree with the trial court that the facts belie defendant's witnesses' initial fears of coming forward. We also find no error in the trial court's ruling with respect to the conclusive nature of defendant's witnesses' testimony. We agree that Jerome Hunt's and Ed Young's testimony that defendant was not the same body type as the shooters was inconclusive, as their statements were based on shadows and figures they observed from a considerable distance, and they were unable to positively identify any shooter in the incident.

The trial court's finding that the testimony of Turonica Williams was inconclusive is also supported by the record. Although she may have rightly concluded that defendant was not one of the two individuals involved in the bumping incident in her house during the party, that fact does not exonerate defendant of the subsequent shooting incident. Significantly, Turonica Williams' testimony directly

contradicted statements she made to detectives days after the shooting incident. Furthermore, after she moved from her neighborhood, she was aware that defendant was in custody on murder charges but never contacted anyone with the information that she presented at the posttrial hearing.

We also agree with the trial court that Levelle Williams' testimony that he observed the State's witnesses coordinating their testimony during a recess at trial is suspect. The transcript of the trial proceedings indicates that no such recess took place on the day that Levelle Williams claims to have been present in court. Likewise, we find no error with the trial court's finding that Lamar Williams' testimony lacked credibility. In light of his statements made during the posttrial hearing that contradicted his own testimony and contradicted statements he had made to the police, we agree that Lamar Williams' testimony was unreliable.

Therefore, in our view, the trial court did not err in finding that the testimony of the defense witnesses was inconclusive and impeached and could have been discovered prior to trial through the exercise of due diligence. Accordingly, we hold that the trial court did not abuse its discretion by denying defendant's posttrial motion to grant a new trial based on newly discovered evidence.

## II

Next, defendant contends that the trial court erred when it failed to inquire during *voir dire* if the venire members would be prejudiced by knowledge of defendant's membership in a gang. Defendant claims that the trial court had a duty to make such an inquiry *sua sponte*. The State argues that the court did not abuse its discretion in the instant case. The contention of the State is well founded.

■ Generally, Illinois courts are afforded broad discretion in determining questions and procedures for *voir dire* based on the necessities of each case. *People v. Washington*, 104 Ill. App. 3d 386, 390, 432 N.E.2d 1020, 1024 (1982). The standard for determining whether the trial court abused its discretion in this matter is whether the means employed to test juror impartiality have created a reasonable assurance that prejudice would be discovered if present. *People v. Lanter*, 230 Ill. App. 3d 72, 75, 595 N.E.2d 210, 213 (1992); *People v. Bunch*, 159 Ill. App. 3d 494, 510, 512 N.E.2d 748, 759 (1987).

■ In the instant case, the trial court informed both parties of its procedures for conducting *voir dire*. The court's *voir dire* examination that followed consisted of numerous general questions regarding the venire members' predispositions toward fundamental principals of law, burden of proof, the importance of following instructions and the

law, and their ability to render a fair and impartial verdict. The court also ascertained whether any venire member had been the victim of a crime, and when answered affirmatively, the court conducted further questioning into the nature of those crimes and whether the experiences of those venire members would affect their ability to be fair. As a result of *voir dire*, defendant struck a potential juror based on her possible prejudice against gang members due to a crime perpetrated against her brother. In addition, the trial court excused a venire member who indicated that she had previously served as a juror in a murder case. At no time did either party tender further questions for the trial court to include in *voir dire*. Moreover, defense counsel failed to make an objection regarding this issue during *voir dire* and failed to raise the issue in defendant's posttrial motion for a new trial.

Nevertheless, defendant cites *People v. Jimenez*, 284 Ill. App. 3d 908, 672 N.E.2d 914 (1996), for the proposition that, during *voir dire*, a court has an affirmative duty to make an inquiry to prevent possible jury bias against gang members. However, we find *Jimenez* to be inapposite. *Jimenez* involved the trial court's refusal to pose questions tendered by defense counsel. Although the court held that the trial court erred by failing to question venire members as to possible bias against gang members, its ruling was based on the fact that the questions were properly tendered by defense counsel and improperly refused by the trial court. *Jimenez*, 284 Ill. App. 3d at 913, 672 N.E.2d at 917. In our view, the trial court in the case at bar committed no error. We hold that the trial court had no duty to make inquiries *sua sponte* regarding gang bias. See *People v. Porter*, 111 Ill. 2d 386, 401-02 (1986) (trial court's failure to pose *voir dire* questions regarding racial bias not error since defense counsel failed to request such questioning); *People v. Diggs*, 243 Ill. App. 3d 93, 96, 612 N.E.2d 83, 85 (1993) (trial court had no duty to question venire *sua sponte* as to racial prejudice).

### III

Defendant also argues that he was denied his right to a fair trial by statements made by the prosecutor during closing argument that were improper, inflammatory, and included evidence not presented at trial. We disagree.

■ Generally, the prosecution is given considerable latitude in closing argument, provided the remarks are based on the evidence and reasonable inferences therefrom. *People v. Cisewski*, 118 Ill. 2d 163, 175-76 (1987). Nonetheless, repeated acts of prosecutorial misconduct during closing argument may warrant a new trial. *People*

*v. Ray*, 126 Ill. App. 3d 656, 660-61, 467 N.E.2d 1078, 1081-82 (1984). In reviewing claims of prosecutorial misconduct, the closing arguments of both parties must be examined in their entirety with allegedly improper comments being placed in the proper context. *Cisewski*, 118 Ill. 2d at 175-76. To constitute reversible error, the complained-of argument must have resulted in a substantial prejudice to the defendant, such that, absent those comments, the result would have been different. *Cisewski*, 118 Ill. 2d at 175.

Defendant complains of portions of the State's closing argument in which the prosecutor stated:

"This is a case about good and evil.
***

This is evil. This is Raymond Malone after he encountered Michael Williams and [Hodby], after they brutally in cold blood executed him ***.

That's the value they placed on human life ***.
* * *

*** [Y]ou know from what happened out there on August 28 that we are dealing with evil, wicked, vicious people, and [Scott Tyler] would have been remiss if he didn't make sure that his loved ones were safe before he took that act of courage and came forward and identified the killers in this case.
* * *

What your duty in this case is to [*sic*] decide—to send a message to the likes of Michael Williams and to say we are governed by the rule of law. We do believe in a society where things are decided in courtrooms and not on the street.
* * *

[Defendant] didn't do it on La Salle Street, and he didn't do it in the suburbs. He did it in Russell Square Park *** at a party that had a lot of gang members present, and he did it at a time of night when the gang members are taking over the street.

And there are nice people in that neighborhood. *** But those people are under their beds at 1:25 in the morning.

They're watching for the bullets to come through the windows because you don't even have to go out on the street to get shot *** and there's nine hundred murders in this city every year, and about seven hundred of them are just like this, and the witnesses aren't a heck of a lot better than the guys who pull the triggers."

■ In our view, the prosecution flirts with error when its closing arguments depict defendants as being evil persons and victims as being good persons. Although we disapprove of the State's characterization of defendant as evil, when examined in the context of the entire closing arguments, in our view, the complained-of statements did not

constitute reversible error. See *People v. Jackson*, 84 Ill. 2d 350, 360 (1981); *People v. Burnett*, 27 Ill. 2d 510, 517 (1963).

While we also disapprove of the prosecutor's comment to the jury asking them to send a message, we believe that this comment was harmless. The prosecutor is allowed considerable latitude in closing argument so long as his comments are based on evidence or reasonable inferences, and any improprieties therein do not warrant reversal unless they are so prejudicial as to constitute a material factor in the conviction or otherwise deprive defendant of a fair trial. See *People v. Evans*, 173 Ill. App. 3d 186, 205, 527 N.E.2d 448, 461 (1988). See also *People v. Hope*, 116 Ill. 2d 265, 277-78 (1986), and *People v. Jackson*, 84 Ill. 2d at 360.

Defendant's additional claim that the State committed error in commenting that its witness, Scott Tyler, did not come forward immediately due to defendant's acts of intimidation is without support. The prosecution stated that Tyler "would have been remiss if he didn't make sure that his loved ones were safe before he took that act of courage and came forward." Contrary to defendant's argument, the prosecution, by this statement, did not remark that defendant had engaged in any acts of intimidation.

## IV

Lastly, defendant claims that he was denied his right to effective assistance of counsel. Defendant bases this argument on the fact that his attorney failed to tender supplemental *voir dire* questions and failed to object to the complained-of remarks by the prosecution during closing argument. The State contends that defendant fails to satisfy the test for a claim of ineffectiveness and that defense counsel's failure to object to the complained-of closing arguments constituted harmless error. We agree.

Claims of ineffective assistance of counsel are decided in accordance with the two-part test delineated in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under this test, a defendant must establish that counsel's representation fell below an objective standard of reasonableness and that there was a reasonable probability that, but for the attorney's unprofessional errors, the result of the trial would have been different. *People v. Whitehead*, 169 Ill. 2d 355, 380 (1996), citing *Albanese*, 104 Ill. 2d at 525. Illinois courts have noted that the standard for judging a claim of ineffectiveness must be whether counsel's conduct so undermined the operation of the adversarial process that the trial cannot be relied upon as having achieved justice. *Albanese*, 104 Ill.

2d at 525, quoting *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064. A claim of ineffectiveness that arises from a matter of defense strategy will not support the claim. *People v. Orange*, 168 Ill. 2d 138, 153 (1995); *People v. Flores*, 128 Ill. 2d 66, 106 (1989).

■ In the case at bar, defendant asserts that an attorney's failure to submit supplemental questions for *voir dire* can support a claim of ineffectiveness. As the supreme court recently held in *People v. Lear*, 175 Ill. 2d 262, 270 (1997), however, the issue of tendering supplemental *voir dire* questions is a matter within the protected realm of defense strategy. Although defendant may question the strategic value of deciding not to tender such questions, we hold that defense counsel's inaction in this matter fell within the broad range of defense tactics that Illinois courts have long considered to be an improper basis for supporting a claim of ineffective assistance of counsel. *People v. Guest*, 166 Ill. 2d 381, 394 (1995); *Flores*, 128 Ill. 2d at 106; *People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988) (mistakes in trial strategy or in judgment alone do not render representation incompetent); *People v. Madej*, 106 Ill. 2d 201, 214 (1985). Indeed, it is plausible that defense counsel chose not to tender supplemental questions in order to avoid having a jury that might place more credence in the State's occurrence witnesses, as most of them were gang members.

In addition, defendant's claim of ineffectiveness based on defense counsel's failure to object to the prosecutor's remarks during closing argument is unpersuasive for reasons previously stated.

Accordingly, we affirm the decision of the trial court.

Affirmed.

TULLY, J., concurs.

JUSTICE RAKOWSKI, specially concurring:
I part company with the majority's statement:
> "the prosecution flirts with error when its closing arguments depict defendants as being evil persons and victims as being good persons." 295 Ill. App. 3d at 467.

I would think that most reasonable people would agree that this senseless murder was evil, brutal, and in cold blood as depicted by the State. Moreover, to call the defendant evil, wicked, and vicious is completely proper. Webster defines "evil" as "morally reprehensible"; "sinful [and] wicked"; "arising from actual or imputed bad character or conduct"; "causing discomfort or repulsion"; "offensive"; "disagreeable"; "causing harm"; "something that brings sorrow, distress, or

calamity." Merriam-Webster's Collegiate Dictionary 402 (10th ed. 1996). All of these terms aptly portray defendant's conduct.

Nor do I find anything improper in the prosecution's charge to the jury that it is their duty "to send a message to the likes of Michael Williams and to say that we are governed by the rule of law."

I agree in all other respects with the majority opinion. I write separately only to express my opinion that the prosecution's argument and remarks were completely proper under the facts of this case.