2021 IL App (1st) 170658-U

THIRD DIVISION
March 31, 2021

No. 1-17-0658

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 9646 |
| | ) | |
| PHILIP ANDERSON, | ) | Honorable |
| | ) | Matthew E. Coghlan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

ORDER

¶ 1    *Held*: In ruling upon defendant's motion for a new trial, the trial court improperly attributed the statements of one witness to a second witness and then found that second witness not to be credible based on the mistaken attribution. The case is remanded for conducting new proceedings on defendant's motion for a new trial.

¶ 2    This case stems from the shooting death of Jonathan Hoskins on April 1, 2013. Following a trial, a jury found defendant, Philip Anderson, guilty of first-degree murder. The circuit court sentenced defendant to 65 years' imprisonment. Defendant appeals, arguing his conviction should be reversed because (1) the trial court erred in denying his motion for new trial, (2) Officer Andre Craig was permitted to testify to inadmissible hearsay, and (3) the trial court

"improperly participated in deliberations with the jury while viewing a surveillance video in the courtroom." We vacate the trial court's ruling on defendant's motion for a new trial, and we remand the case with instructions that the trial court conduct new proceedings on defendant's motion for a new trial.

¶ 3                                    BACKGROUND

¶ 4                              Defendant's Trial

¶ 5     The relevant evidence and details from defendant's trial are as follows. The medical examiner testified that the cause of Hoskin's death was gunshot wounds to the head from shots that were fired at close range. An evidence technician found two fired shell casings at the scene.

¶ 6                          Testimony of Linda Hammer

¶ 7     Linda Hammer, a United States Postal Service letter carrier, testified that she was on her route the morning of April 1, 2013, on Eberhart Avenue between 74th Street and 75th Street when she saw a man approach a group of people that were on the side of the road. She saw the man pull out a gun, fire the weapon, and then run back in the direction from which he came. Hammer testified that she could not see the shooter's face or identify the shooter, but noted he was wearing a black hoodie and black jeans.

¶ 8                       Testimony of Officer Andrew Craig

¶ 9     Chicago police officer Andrew Craig testified that he was on patrol the morning of April 1, 2013 and was dispatched to the scene of the shooting. He and his partner arrived within minutes of the dispatch call and saw a person unresponsive on the ground. Officer Craig specifically testified that he canvassed the area to "see[ ] if anyone noticed anything or if they had any idea as to what happened." Officer Craig testified that he engaged in the effort to identify potential witnesses so they could be interviewed by detectives and he spoke to people

who were present at the time of the shooting. The following exchange occurred, without objection, between Officer Craig and the prosecutor:

"[ASSISTANT STATE'S ATTORNEY]: After being on the scene, did you and other officers have a name or any identification on the potential suspect?

A. Yes.

Q. Who was that?

A. LP.

Q. Did you—were you made to understand that was a nickname?

A. Yes.

Q. Was there any indication of what—of the real name of that person?

A. Yes.

Q. What was that?

A. Philip Anderson."

¶ 10                              Testimony of Charles Ambrose

¶ 11    Charles Ambrose testified that at the time of trial he was in the custody of the Illinois Department of Corrections for a parole violation for unlawful use of a weapon by a felon, a prior robbery conviction, and he had a pending narcotics charge in Cook County. On April 1, 2013, he was on Eberhart Avenue between 74th and 75th Streets with a group of people standing on the street around Hoskins. Ambrose was standing from 10 to 15 feet away with his back to Hoskins when he heard a gunshot, turned his head, and saw Hoskins fall. He did not see anyone approach the group prior to the shooting. Ambrose testified he stayed hidden and away from the sound of the gunshot for about five minutes and when he came out Hoskins was on the ground. Police arrived approximately 10 minutes later.

¶ 12    Ambrose spoke to police at the station following the incident. He testified he was not under arrest and police never informed him he was a suspect. He denied telling police he clearly saw the shooter and that the shooter was LP. Specifically, the prosecutor asked Ambrose, "When the police offices on the scene, you never said that a person you knew as LP shot Jonathan?" to which Ambrose responded "I said I never told them no LP shot Jonathan." He added, "I don't even know LP."[1] He told the police he was under the influence of ecstasy and marijuana on April 1, 2013. He acknowledged being shown a photo array "to determine whether [he] could identify the person [Ambrose] called LP." Ambrose testified he told the detectives he did not recognize anyone. A detective pointed to one of the five photographs and said, "Is this him?" "This is the shooter." Ambrose testified he told the officers he never saw the shooter but defendant was not the shooter. The detective told Ambrose to sign under defendant's photograph, so he did. At trial Ambrose acknowledged his signature on the photo array. The prosecutor showed Ambrose a picture and asked, "You don't know if this is a picture of LP?" Ambrose responded, "No."

¶ 13    Ambrose testified he did not recall meeting with an Assistant State's Attorney later that day regarding a written statement. He did not recall telling police that no threats or promises were made to him relative to his statement. He did not recall a written statement being prepared for him. He admitted to signing the statement but stated it had already been written out when he signed the pages.

¶ 14    Ambrose recalled testifying before a grand jury but did not recall the exact date. He testified that he did not remember whether he believed he was a suspect when he testified before the grand jury. He did not recall being sworn in prior to his testimony or affirming that his

_____

[1]We note that this testimony came after Officer Craig testified he learned from an unidentified witness that LP is defendant.

testimony before the grand jury was made freely and voluntarily. He recalled being asked questions about the April 1, 2013, shooting but did not recall his grand jury appearance because at the time he was high on ecstasy. He remembered testifying that on April 1, 2013, he was outside 7438 S. Eberhart Avenue standing with a group of people. He denied testifying he saw a person in a black hoodie with the hood pulled over his head approach from the alley. Ambrose denied testifying before the grand jury that he saw the shooter's face and that it was LP. Ambrose admitted being asked at the grand jury proceeding if he knew LP by his nickname but had never met "LP," and Ambrose admitted answering affirmatively to that question. Ambrose stated, "I knew him as the nickname."

¶ 15    He did not remember telling the grand jury that he had seen LP behind the victim or the flash of a gun but did remember testifying he heard two gunshots before seeing Hoskins's body fall to the ground. He denied telling the grand jury that he saw the shooter's face, that the shooter was LP, and that he had seen LP days before in a car. He did not remember stating LP walked off after the shooting. He admitted telling the grand jury he did not know LP and, while familiar with his nickname, had never met him. At trial, an assistant state's attorney who was present for Ambrose's grand jury testimony read into the record Ambrose's grand jury testimony.

¶ 16                          Testimony of Detective Gregory Jones

¶ 17    Detective Gregory Jones testified he was assigned to investigate the April 1, 2013 shooting of Hoskins. That same day, Detective Jones spoke with Ambrose, who identified the person he referred to as LP as the shooter and pointed him out in a photo array. Jones testified that Ambrose indicated he knew who the shooter was prior to picking "LP" out in the photo array. No one in Detective Jones' presence told Ambrose who to pick out in the photo array.

Detective Jones testified that during his investigation no one identified to him anyone "other than the defendant" as the perpetrator of the shooting.

¶ 18    When Jones was at the scene, he observed two video cameras with a view of the alley in the vicinity of the shooting from which he recovered footage which was played at trial. Jones testified he reviewed the footage and observed a black male suspect in a dark hoodie with white letters across the front which was pulled up over his head and dark pants. The individual was walking eastbound toward Eberhart Avenue through the north alley of 75th Street and then shortly after was again visible running westbound through the same alley. Detective Jones testified that the face of the individual in the footage was not visible.

¶ 19                    Testimony of Assistant State's Attorney Tom Prisco

¶ 20    Assistant State's Attorney Tom Prisco testified that he met with Ambrose over the course of April 1 and 2, 2013, after which Ambrose agreed to give a written statement that Prisco transcribed by hand. In that written statement, Ambrose acknowledged that he identified a photograph of LP and identified LP as the shooter. Ambrose also stated in his statement that he never met LP and that, one week prior to the shooting, someone showed him a picture and told him the picture was of LP. In his statement, Ambrose stated he does not know LP's real name and that he only recognized LP from the picture he had been shown a week before the shooting. The statement was written in Ambrose's presence, and Prisco went through the statement with Ambrose to make sure what was written was correct. The statement was entered into evidence. Ambrose acknowledged that no one had threatened him or forced him to make his statement. Prisco testified that the photo array was presented to Ambrose prior to their meeting but that he discussed Ambrose's viewing of the photo array.

¶ 21                              Testimony of Tyson Kirkman

¶ 22    At trial, Tyson Kirkman, testified that he was in custody at the Indiana Department of Corrections serving a sentence for possession of a controlled substance and he had three prior felony convictions. He had known Hoskins since grammar school and was with him and a group of other individuals the morning of April 1, 2013, standing outside together on 74th Street and Eberhart Avenue. He testified he heard gunshots fired in quick succession and ran, tripped, and fell, rolling onto a nearby car and ending up under a car. While rolling on the car, he looked up and saw Hoskins falling backward and, for a split second, saw the shooter's face as he was turning around running. The entire incident happened in seconds. He did not see the shooter approach. At the time of the shooting, Kirkman testified he was standing close enough to Hoskins that he could have reached out and touched him. Kirkman testified the shooter was wearing a black hoodie with the hood pulled up. He could make out a little bit of the shooter's face but not all of it with the hoodie. He could not make out a gun in the shooter's hand. Kirkman testified the shooter was light skinned.

¶ 23    After the shooting, Kirkman got up to check Hoskins, but Hoskins was not breathing or moving. The police were called, and Kirkman left the scene because he was on parole and house arrest and was not supposed to be around such incidents and did not want to get in trouble. Kirkman testified Hoskins was his friend and his death was upsetting.

¶ 24    The night of the shooting, police contacted Kirkman at a halfway house, picked him up, and took him to the police station. Kirkman testified he knew defendant from the neighborhood, having grown up in the same area. Kirkman testified he saw the person who shot the victim. He testified LP was the shooter. Kirkman identified defendant in open court as LP. At the time of

the shooting Kirkman knew LP's real name to be Philip Anderson. Kirkman knew LP because they grew up around the same area.

¶ 25    Kirkman testified Elizabeth Coats was his cousin. He denied going to her in April when he was evading police and stated that he never saw his cousin after the shooting. He denied telling her that he was on the run because of telling the police that defendant shot Hoskins. He denied telling Coats he had lied to the police when he identified defendant as the shooter. He denied telling Coats that he only told police defendant was the shooter because people in the neighborhood had told him to do so.

¶ 26                              Testimony of Elizabeth Coats

¶ 27    Coats, Kirkman's cousin, testified that on April 10, 2013, she picked Kirkman up from where he was staying and that he stayed at her home that night. Coats testified that Kirkman told her that he had gotten into some trouble because police picked him up after a shooting. Kirkman told her that he told the police that defendant shot Hoskins because some people from the neighborhood were threatening him. Coats stated that defendant told her that his friends were threatening him because they were in conflict with defendant. Kirkman's friends purportedly said that defendant was a problem and they needed him off the streets; they wanted to get rid of defendant. Kirkman told Coats he lied to the police and that he had not seen the person who shot Hoskins. Kirkman also told her he agreed with the police to "cover himself" because they were threatening to call his parole officer. The police learned Kirkman was supposed to have been at a halfway house but missed his curfew, so he told the police he witnessed defendant shoot Hoskins.

¶ 28                     Testimony of Cleveland Dorsey

¶ 29    Cleveland Dorsey testified he had known LP since approximately 2005 "from the area" and from going to school together. Cleveland Dorsey knew LP's real name was Philip Anderson. On April 1, 2013, Cleveland Dorsey was standing with a group of people, including his cousin, Denone Dorsey, on Eberhart Avenue, a short distance down the block from where Hoskins was located. Dorsey testified that a person walked past him in a dark hoodie that was up and dreadlocks were sticking out. That person walked up to Hoskins and shot him twice. Thereafter, the shooter walked south and crossed the street before going into an alley or gangway. Dorsey knew both Hoskins and defendant from the neighborhood. Dorsey stated that he saw the shooter's face and would recognize him, but he testified that he did not see the shooter in court that day. After the shooting, Dorsey contacted the defense attorney's office after seeing flyers posted around the neighborhood requesting information on the case. Though he knew defendant had been arrested in April 2013, he did not approach defense counsel with his statement until September 2015. Dorsey never went to the police with his information. He went to speak with the defense attorneys because he wanted to do the right thing.

¶ 30                     Testimony of Denone Dorsey

¶ 31    Denone Dorsey, Cleveland's cousin, testified that he was talking with Cleveland and a group of people when a person walked past him, crossed the street, went up to Hoskins, shot him, and then ran south. Denone testified the shooter had brown skin, was wearing a hoodie that did not cover his whole face, and had dreadlocks. He did not get a full look at the shooter's face but did remember a little bit of it. He testified he knew both Hoskins and defendant from the neighborhood. Denone testified he knew defendant as LP. He testified that defendant was not the shooter. He described defendant as an associate rather than a friend. He testified he did not

recognize the shooter. Denone did not go to the police after learning defendant had been arrested. Denone contacted defense counsel after seeing a flyer and subsequently signed a statement. He spoke with Cleveland about the flyer and their statements, but he did not discuss his trial testimony with Cleveland.

¶ 32                              Testimony of Paris Fowler

¶ 33    Paris Fowler, defendant's fiancée, testified that on March 31, 2013, Easter Sunday, she and defendant attended church with Vernita Anderson, defendant's mother. Fowler spent the night at her mother's home, with defendant, in a guest bedroom. Venita Anderson testified consistently at trial and also testified that Fowler and defendant were still at her home when she left for work the following day, April 1, 2013, at 6:30 a.m.

¶ 34    Fowler woke up the morning of April 1, 2013, and at approximately 10 a.m. had a 30-minute telephone conversation with her grandmother. She subsequently searched social media on the computer until approximately 11:15 a.m. when she got back in bed. She testified defendant had not left while she was on the phone and computer, and he was still in bed when she laid back down at 11:15 a.m. She testified that Venita's home was in University Park, about an hour drive from where the shooting incident took place.

¶ 35                           Verdict and Posttrial Proceedings

¶ 36    Following deliberations, the jury found defendant guilty of first-degree murder. Defendant filed a motion for new trial in which he raised a claim of actual innocence based on newly discovered evidence.

¶ 37    In support of his motion for a new trial, defendant attached an affidavit by Kirkman, dated July 14, 2016, in which Kirkman recanted his trial testimony. Kirkman attested that he did not see the shooter's face and claimed that he lied at trial when he identified defendant as the

shooter. Kirkman averred that he lied at trial because he and his family were being threatened and he was told that if he did not "stick to his story" implicating defendant, then he would be charged and tried for Hoskins's murder. Kirkman had since relocated away from Chicago and felt guilty for having put an innocent man in jail for the rest of his life. He concluded " 'LP' did not kill Jonathan Hoskins."

¶ 38    The trial court conducted an evidentiary hearing on defendant's motion for new trial. Kirkman testified at the evidentiary hearing. Kirkman testified that he did not see defendant at the shooting, did not see the shooter, and could not describe anything about the shooter. Kirkman further testified at the evidentiary hearing that he named defendant as the shooter at trial because he and his family were being threatened after the shooting. The trial court denied defendant's motion for new trial.

¶ 39    The trial court's oral ruling commenced with a recitation of certain facts as the court understood them stating "[Kirkman] signed a written statement identifying the defendant and testified under oath before the Grand Jury consistent with that identification." The trial court "found [Kirkman's] recantation testimony to be entirely incredible" having watched his testimony at trial and at the evidentiary hearing on defendant's motion for new trial. The court found the recantation testimony was not of such a conclusive nature that it would probably change the result at retrial. The court stated that "[Kirkman] fail[ed] to name who made the threats" that led him to identify defendant as the shooter. The trial court further concluded that Kirkman's testimony in which he stated he was threatened was merely cumulative because "the jury already heard and rejected evidence that Kirkman's identification of the defendant was due to alleged threats to him and his family" and thus, the new evidence "merely impeaches and contradicts the witness."

¶ 40    The trial court stated that Kirkman's recantation testimony was "rebutted by the relative immediacy of [Kirkman's] identification of the defendant to police" made "the very same day of the murder within hours." The trial court found that Kirkman's trial testimony was corroborated by other trial witnesses to include an eyewitness who recanted his prior identification at trial, the video from the alley where the "individual seen running with the gun matched the defendant's description, height and weight based on the court's observation." The trial court concluded that Kirkman's recantation testimony "merely impeaches and contradicts the witness *** [and] thus does not require a new trial." The court stated, "For all these reason[s], the defendant's motion for a new trial is denied."

¶ 41    Following a sentencing hearing, defendant was sentenced to 65 years' imprisonment. Defendant now appeals.

¶ 42                                ANALYSIS

¶ 43    Defendant argues that his conviction should be reversed and that the case should be remanded for new trial because (1) the trial court erred in denying his motion for new trial based on newly discovered evidence of actual innocence, (2) Officer Craig was permitted to testify to inadmissible hearsay, and (3) the trial court "improperly participated in deliberations with the jury" while viewing a surveillance video in the courtroom with the parties present. Defendant failed to preserve the final two claims for review because he failed to object during trial or raise the issues in a posttrial motion. See *People v. Piatkowski*, 225 Ill. 2d 551, 564 (issues not raised at trial or in a posttrial motion are not preserved for review and are forfeited). We do not address whether those challenges could amount to plain error, but our decision to refrain from reaching those issues is without prejudice to defendant potentially raising the question of plain error in the future.

¶ 44    As to his argument that the trial court erred when it denied his motion for a new trial, defendant argues that newly discovered evidence of actual innocence entitled him to a new trial. Specifically, defendant points to the affidavit and testimony of Tyson Kirkman who, following trial, recanted his trial testimony wherein he had previously identified defendant as the shooter.

¶ 45    A new trial is warranted based on newly discovered evidence where:

> "(1) it has been discovered since the trial; (2) it is of such a character that it could not have been discovered prior to the trial by the exercise of due diligence; (3) it is material to the issue but not merely cumulative; and (4) it is of such a conclusive character that it will probably change the result on retrial." *People v. Williams*, 295 Ill. App. 3d 456, 462 (1998).

We review the trial court's denial of a motion for new trial for an abuse of discretion. *Id.*

¶ 46    Defendant's claim of actual innocence is predicated on Kirkman's recantation of his trial identification testimony which defendant submitted in support of his motion for a new trial. A reviewing court will not disturb a trial court's credibility findings as to the new evidence where the trial court has held an evidentiary hearing on the new evidence unless the findings are manifestly erroneous, where "the error is clearly evident, plain, and indisputable."  (Internal quotation marks omitted).  *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 47    The trial court's justification for finding Kirkman's recantation testimony not credible was inconsistent with the record evidence which leads us to conclude that the credibility findings were manifestly erroneous. See *Morgan*, 212 Ill. 3d at 155. Significantly, the trial court's oral ruling commenced with a recitation of certain facts as the court understood them, including a statement that "[Kirkman] signed a written statement identifying the defendant and testified under oath before the Grand Jury consistent with that identification."  However, as defendant

points out, those events did not happen and there is nothing in the record to support the trial court's statements. Instead, the record demonstrates that Ambrose, not Kirkman, gave a written statement and testified before the grand jury.

¶ 48    The State acknowledges "the record here does show the trial judge misattribut[ed] a portion of Charles Ambrose's trial testimony to [Kirkman]" but the State argues that "a trial judge is presumed to have considered only properly admitted evidence in making his decisions," citing *People v. Rodgers*, 58 Ill. App. 3d 719, 724 (1978). However, this presumption is overcome by the trial court's express statements in the record that it considered this misattributed testimony as a crucial part of its rationale for denying defendant's motion and for finding Kirkman's recantation not to be credible. See *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91 (holding that the presumption afforded to a trial court that it considered only proper evidence does not stand where it is rebutted by affirmative evidence to the contrary).

¶ 49    The State attempts to minimize the importance of the trial court's mistaken recollection, arguing that the trial court's mistake was not necessarily "a key component of the trial court's ultimate ruling." However, the success of defendant's motion depended entirely on the trial court's assessment of Kirkman's credibility. In order for defendant to be entitled to a new trial, the trial court would have had to find Kirkman's recantation testimony to be of such a conclusive character that it would probably change the result on retrial. See *Williams*, 295 Ill. App. 3d at 462. The trial court's mistaken belief that Kirkman's testimony in support of the motion for a new trial was inconsistent with two prior statements—a signed written statement and, more importantly, sworn testimony before a grand jury—was crucial to the court's assessment of Kirkman's credibility. The trial court's belief that Kirkman made those two statements that, in

fact, Ambrose made played a significant role in the trial court's decision and was among the first things mentioned in the trial court's ruling.

¶ 50    The trial court made other potentially problematic findings in assessing Kirkman's credibility, but the misattribution of the witnesses' statements sufficiently undermines the confidence in those proceedings such that the ruling on the motion for a new trial cannot stand. See *Simon*, 2011 IL App (1st) 091197, ¶ 91.  The trial court's credibility finding was expressly made on an improper characterization of the evidence. The trial court mistakenly attributed the actions of Ambrose to Kirkman and then found Kirkman's testimony to not be credible because of actions that Ambrose had taken. The misattribution of the testimony is clearly evident, plain, and indisputable. See *Morgan*, 212 Ill. 2d at 155. Accordingly, we hold that defendant is entitled to a re-adjudication of his motion for a new trial. Ill. S. Ct. R. 615 (West 2018) (eff. June 1, 2020). Thus, we vacate the trial court's ruling on defendant's motion for a new trial and remand the case for new proceedings on defendant's motion for a new trial.

¶ 51                              CONCLUSION

¶ 52    The judgment of the circuit court of Cook County is reversed and the cause is remanded with instructions that the trial court conduct further proceedings on defendant's motion for a new trial.

¶ 53    Reversed and remanded with instructions.