2023 IL App (1st) 211407-U

No. 1-21-1407

March 21, 2023

SECOND DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | |
| v. | ) | No. 13 CR 9646 |
| | ) | |
| | ) | Honorable |
| PHILIP ANDERSON, | ) | Matthew E. Coghlan and |
| | ) | William B. Raines, |
| Defendant-Appellant. | ) | Judges Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1     *Held*:  The court erred in denying defendant's motion for a new trial where a witness's recantation at a hearing on the motion was newly discovered, material, and likely to change the result on retrial.

¶ 2     Following a jury trial, defendant Philip Anderson was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 65 years' imprisonment. At the hearing on defendant's motion for a new trial, a witness recanted his trial testimony identifying defendant as

the offender. The trial court denied the motion but, in its oral ruling, misstated certain evidence. On direct appeal, we remanded for a new hearing on the motion because the court's justification for denying relief was "manifestly erroneous." See *People v. Anderson*, 2021 IL App (1st) 170658-U, ¶¶ 47, 52. On remand, the court conducted another hearing and again denied defendant's motion for a new trial.[1]

¶ 3    In this appeal, defendant contends that the court erred on remand in denying the motion for a new trial because, at the first hearing, the State's primary eyewitness recanted his trial testimony. Defendant further argues that the admission of a police officer's testimony at trial regarding conversations at the scene of the incident was plain error. For the following reasons, we reverse the denial of defendant's motion for a new trial and remand the matter for a new trial.

¶ 4                              BACKGROUND

¶ 5    Defendant was charged with first degree murder and other offenses arising from the shooting death of Jonathon Hoskins on April 1, 2013. The evidence adduced at trial is detailed in this court's first order on direct appeal. See *id.* Accordingly, we only recount the facts necessary to resolve the issues presently on appeal.[2]

¶ 6                          Defendant's Trial

¶ 7    At trial in 2016, Linda Hamer, a United States Postal Service letter carrier, testified that she was on her route the morning of April 1, 2013, on Eberhart Avenue between 74th Street and 75th Street when she saw a man approach a group of people on the side of the road. The man drew

---

[1] The Honorable Matthew E. Coghlan presided over defendant's trial and the first hearing on his motion for a new trial. The Honorable William B. Raines presided on remand.

[2] The trial exhibits are not included in the record for the present appeal. Descriptions of the exhibits are derived from the prior order on appeal.

a firearm, discharged it, and fled in the direction from which he came. Hamer could not see the shooter's face or identify him, but noted he wore a black hoodie and black jeans.

¶ 8    Chicago police officer Andre Craig testified that he responded to a call of shots fired on South Eberhart and spoke with pedestrians to see "if anyone noticed anything" and to identify potential witnesses. After speaking with individuals, Craig and other officers learned the name of a potential suspect, "LP," which Craig also learned was defendant's nickname. Defense counsel did not object to this testimony or cross-examine Craig.

¶ 9    Charles Ambrose testified that he was incarcerated for a parole violation at the time of trial, had a pending narcotics case, and had been convicted of robbery and unlawful use or possession of a weapon by a felon. Ambrose stated that he was standing with Hoskins on the sidewalk when Hoskins was shot. Ambrose heard a noise "[l]ike a firecracker" and saw Hoskins fall from 10 to 15 feet away. Ambrose did not see anyone leave the scene or approach Hoskins.

¶ 10    Ambrose acknowledged speaking with officers at the police station, but denied telling them that he was with Hoskins and another person in front of a building on South Eberhart. Ambrose denied telling police that he saw LP shoot Hoskins, and testified instead that he did not know LP. Ambrose also denied telling officers that he saw a person walking north on the west side of the street with a dark hoodie pulled over his head. He denied telling police that when the person approached, he "clearly" saw it was LP, or that LP walked toward him, "raised his arm and shot [Hoskins] in the back of the head." He denied telling police that LP then turned, ran southbound down Eberhart, and westbound through the north alley of 75th. Additionally, he denied telling police that he had seen LP driving north on Eberhart from 75th in a tan Lincoln Continental approximately three days before the incident.

¶ 11    Ambrose further testified that he viewed a photo array, but informed officers that he did not recognize anyone in the array. Ambrose acknowledged signing the photo array, but denied writing "LP, shooter" on it. Ambrose identified his signed photo array advisory form and the photo array with one photograph annotated "April 1, 2013, LP shooter, 8:29 p.m." in his handwriting with his signature. Ambrose testified that an officer told him to write that.

¶ 12    Ambrose also gave a statement, transcribed by an assistant State's Attorney (ASA). Ambrose identified his signature on the written statement, but did not know if the attached photograph, which he signed, depicted LP. Ambrose denied telling police officers that he was not under the influence of marijuana or alcohol at the time he gave his statement, and did not recall stating that he gave his statement freely and voluntarily.

¶ 13    Ambrose testified that he told a grand jury that he stood on the sidewalk with Hoskins, but denied stating that he saw someone approach the group wearing a black hoodie with the hood raised. Ambrose denied testifying that he knew the person was LP because he had seen LP in a vehicle several days earlier. Ambrose agreed that he testified that he heard two shots and saw Hoskin's body drop to the ground but did not remember testifying that he saw LP stand "a step" behind Hoskins and extend his arm before the shots were fired and then walk away. Ambrose did not recall testifying about viewing a photo array. Further, Ambrose was high "off pills," namely Ecstasy, "around" the time he testified before the grand jury. Ambrose did not recall telling the grand jury that his statement to police was the same as his grand jury testimony and that he testified freely and voluntarily. Ambrose also did not recall whether he signed a photograph of LP before the grand jury.

¶ 14    On cross-examination, Ambrose stated that he was not under arrest when he spoke to police and did not believe he was a suspect. Nor did Ambrose believe he was a suspect when he testified

before the grand jury. Ambrose did not write the statement to police; rather, he signed all five pages after it had been prepared. Ambrose did not know whether the person in the photograph he signed shot Hoskins.

¶ 15   ASA Tom Prisco testified that early on April 2, 2013, he interviewed Ambrose and handwrote his statement. Prisco identified the statement in court, and the State published it.

¶ 16   In his statement, Ambrose stated that on April 1, 2013, he was standing outside with friends, including a person he knew as "JD," near 75th and Eberhart. A person wearing a dark hoodie pulled over his head approached from an alley. Ambrose recognized the person as defendant, initialed a photograph of defendant, and commented that it was daylight with nothing obstructing his view. Defendant walked behind JD. Then, defendant raised his arm, pointed a firearm to JD's head, fired twice, and ran back to the alley. Ambrose never met defendant before but, approximately one week prior, a person from the neighborhood showed Ambrose a picture of defendant on a cellular telephone. Ambrose was also told "to stay away" from defendant because defendant "cause[d] trouble." Approximately three days before giving the statement, Ambrose saw defendant driving an older Lincoln Continental through the neighborhood. Ambrose spoke with police officers and identified defendant from a photo array.

¶ 17   Prisco and Ambrose reviewed the statement and Ambrose signed each page to show that it was true and accurate. Ambrose stated that at the time of the shooting, he was not under the influence of marijuana or alcohol but had smoked "a blunt" at 8 or 9 a.m.

¶ 18   ASA Joell Bisceglia testified that on April 29, 2013, Ambrose testified before the grand jury regarding the incident. Bisceglia identified the transcript of Ambrose's testimony, which she published. Ambrose testified that he observed defendant, who was wearing a black hoodie, emerge from an alley. Defendant stood behind JD and extended his arm; Ambrose then saw the flash of a

firearm and heard two gunshots. JD fell to the ground and defendant walked back to the alley. Ambrose subsequently identified defendant from a photo array. Ambrose testified that he had seen defendant a few days earlier in a vehicle.

¶ 19 Tyson Kirkman testified that he had been convicted of possession of a controlled substance and other offenses and was incarcerated in Indiana at the time of trial.

¶ 20 On April 1, 2013, Kirkman was with Hoskins and approximately seven other people at 74th and Eberhart. As they were talking, they heard gunshots and everyone ran. Kirkman fell and "roll[ed]" onto a vehicle, then looked up and saw Hoskins fall backward. The person who shot Hoskins was wearing a black hoodie with the hood raised. Kirkman could only see "a little" of the person's face, but knew the person was light-skinned. Kirkman testified that the shooter was defendant, and identified him in court. Defendant turned and ran toward 75th into an alley. After the police were called, Kirkman left the scene because he was on parole and house arrest and was not supposed to be away from his house. Officers later contacted Kirkman and escorted him to a police station, where he gave a statement on the evening of April 1, 2013.

¶ 21 On cross-examination, Kirkman stated that his side was to Hoskins at the time of the shooting and he did not see the shooter approach. Kirkman took cover under a vehicle, looked up as the shooter turned, and briefly saw the shooter's face. Kirkman denied staying with his cousin, Elizabeth Coats, after the incident or telling her that he was "on the run" from police officers because he lied to them "that [defendant] shot [Hoskins]." Kirkman denied telling Coats that he told officers that defendant shot Hoskins because "people in the neighborhood" told him to say that defendant was the shooter.

¶ 22 The State also introduced footage from cameras at a building on the 7400 block of South Eberhart. Detective Gregory Jones testified the footage showed a man in dark clothing walking

eastbound through the alley toward Eberhart. The same person later ran back westbound through the same alley. The man's face was not visible.

¶ 23    For the defense, Coats testified that she saw her cousin, Kirkman, on April 10, 2013, and he told her that he "got into some trouble." Kirkman told Coats that at the time of the killing, he was subject to a curfew and supposed to be at a halfway house. Kirkman also stated that he told the police that he witnessed defendant kill Hoskins because "[h]is friends were threatening him," told him that defendant was a "problem," and said they needed him "off the streets" as they were in rival gangs. Kirkman told Coats that he "agreed with the police" because "the people" were threatening to report him for violating parole and that he did not actually see who shot Hoskins.

¶ 24    Cleveland Dorsey testified that on April 1, 2013, he was outside with his cousin, Denone Dorsey, near the scene of the incident.[3] At approximately 11 a.m., a man wearing a hoodie walked past them to Hoskins, who had his back turned, and shot him twice. Cleveland saw the man's face and testified that he did not see the man in court. Cleveland contacted defense counsel after seeing flyers in the neighborhood seeking information about the case because he wanted to do "the right thing."

¶ 25    On cross-examination, Cleveland stated that he knew defendant was arrested on April 15, 2013, but Cleveland did not speak to the police and only approached defense counsel in September 2015.

¶ 26    Denone testified that on April 1, 2013, he saw a person wearing a hood. Denone remembered "a little bit of his face." He did not know whether he knew the person from the neighborhood, but the person was not defendant.

---

[3] As Cleveland Dorsey and Denone Dorsey share the same surname, we will refer to them by their first names.

¶ 27    Vernita Anderson, defendant's mother, and Paris Fowler, defendant's fiancée, testified that defendant and Fowler attended church with Anderson on March 31, 2013, for Easter Sunday. Anderson, Fowler, and defendant then traveled to Anderson's home in University Park, where they spent the night. Anderson testified that on April 1, 2013, defendant and Fowler were present when she left for work around 6:30 a.m. Fowler testified that defendant was still in bed in Anderson's house at approximately 11:30 a.m. on April 1, 2013.

¶ 28    The jury found defendant guilty of first degree murder.

¶ 29                              Posttrial Proceedings

¶ 30    Defendant filed a motion and amended motion for a new trial, attaching a notarized and signed statement by Kirkman. Therein, Kirkman stated that he falsely identified "LP" as the shooter because he feared for his and his family's safety. The ASA told Kirkman that if he did not "stick to [his] story," he would be charged for the murder. The ASA added that she had a statement from the victim's sister saying that Kirkman was involved in Hoskins' murder. Kirkman stated that he was coming forward now because he relocated from Chicago and could not "move on" knowing that he "sent an innocent man to prison for the rest of his life."

¶ 31    At the hearing on defendant's motion, Kirkman testified that he falsely identified defendant as the shooter because people from the neighborhood threatened Kirkman and his family.  Kirkman did not see the shooter because he ducked under a vehicle and stayed there during the incident. He did not see defendant at the scene of the shooting, did not see the shooter, and could not describe anything about the shooter.

¶ 32    On cross-examination, Kirkman stated that he signed the affidavit the day he was released from custody in Indiana. "Everybody" who disliked defendant threatened Kirkman and his family after Hoskins was shot. Kirkman did not inform the police about the threats when he spoke to them

on the day of the shooting. When Kirkman viewed the photo array, the detectives told Kirkman that they knew the shooter's identity and asked him to sign his name by defendant's picture. When Kirkman spoke to the ASA, she informed Kirkman that he could be charged as a conspirator and that she had a statement from the victim's sister saying that Kirkman was involved in Hoskins' murder.

¶ 33 The court questioned Kirkman regarding his relationship with defendant. Kirkman had grown up with defendant and they belonged to the same gang, the Gangster Disciples. Kirkman also knew Hoskins for the same length of time; Hoskins, however, was involved in the Black Disciples. Kirkman received threats by phone from private phone numbers. The callers told Kirkman to leave town, so he changed his phone number. Callers also threatened his mother and sister by phone. The individuals instructed Kirkman to identify defendant as the shooter. Kirkman testified that telling the police that his family was in danger would have been "the wrong thing to do."

¶ 34 ASA Patricia Melin testified that she prosecuted the trial and spoke with Kirkman prior to his testimony at trial. The defense attorney gave Melin a statement from Coats saying that Kirkman "had changed his mind and was no longer going to identify *** defendant whom he referred to as LP as the shooter." Melin asked Kirkman if that was the case and he was "noncommittal but indicated, yeah," so Melin presumed that he would testify at trial consistently with Coats' statement. Kirkman never told Melin about threats, and she never informed him that she had a statement from the victim's sister or implied that Kirkman would be charged with conspiracy to commit murder.

¶ 35 The court denied defendant's motion, finding that Kirkman's recantation was not credible because he failed to name who threatened him and, at trial, he had denied that his testimony was

due to threats. Further, Kirkman identified defendant as the shooter to police within a few hours of the murder. The court also found that Kirkman's trial testimony was corroborated by other substantive evidence, including Ambrose's testimony before the grand jury and statement to police and footage showing an individual matching defendant's height and weight running with a firearm. The court commented that Kirkman "signed a written statement identifying the defendant and testified under oath before the Grand Jury consistent with that identification."

¶ 36    After a hearing, defendant was sentenced to 65 years' imprisonment.

¶ 37                    Direct Appeal

¶ 38    On direct appeal, defendant argued, *inter alia*, that the trial court erred by denying his motion for a new trial based on newly discovered evidence of actual innocence, namely Kirkman's recantation. *Anderson*, 2021 IL App (1st) 170658-U, ¶ 43.

¶ 39    We found that the trial court's credibility findings regarding Kirkman's recantation were manifestly erroneous where its stated reasons were inconsistent with the record. *Id.* ¶ 47. Specifically, the trial court commented that Kirkman signed a written statement identifying defendant and testified before the grand jury regarding the identification. However, neither event occurred, and nothing in the record supported the court's statements. *Id.* It was Ambrose, not Kirkman, who gave a written statement and testified before the grand jury. *Id.* Because the trial court's assessment of Kirkman's credibility at the motion for a new trial was premised on its improper characterization of the evidence, *i.e.*, on Ambrose's actions rather than on Kirkman's, we found defendant was entitled to a new adjudication of his motion for a new trial. *Id.* ¶ 50. We did not reach the remaining issues raised in defendant's appeal. *Id.* ¶ 43.

¶ 40                    Hearing on Remand

¶ 41    On remand, defendant's motion for a new trial was adjudicated by a different judge. At the new hearing on the motion, defendant did not present live witnesses but referenced the transcript from the prior hearing and argued that Kirkman's recantation "fits more into the case than his actual testimony at trial." Defendant argued Kirkman's recantation established that he observed the incident in his peripheral view and hid under a vehicle after he heard the gunshot, so he would not have been able to see the shooter's face. Further, Coats testified at trial that Kirkman confided that he identified defendant as the shooter only because "people in the neighborhood" told him to do so, which corroborated Kirkman's recantation.

¶ 42    The State argued that the recantation was not newly discovered evidence because Kirkman was a known witness prior to trial, had been cross-examined at trial regarding his inability to see the shooter, and had testified regarding threats made against him in the neighborhood. Further, at the hearing for the motion for a new trial, ASA Melin testified that she never threatened Kirkman to induce him to testify against defendant. Moreover, the State argued, because Kirkman further testified at the hearing that he had known defendant for a long time, his identification of defendant as the shooter was not a case of mistaken identity.

¶ 43    The court denied defendant's motion. In ruling, the court found that the evidence in Kirkman's affidavit was not newly discovered because defense counsel was on notice at trial about Kirkman's alleged statements to Coats and could have recalled him as a witness at trial. The court also reviewed Kirkman's trial testimony and found it to be credible because he "stood his ground" when defense counsel impeached him, and his recantation was not credible. The court commented that defense counsel's decision not to recall Kirkman was strategic and not ineffective assistance.

¶ 44                                    ANALYSIS

¶ 45 On appeal, defendant first argues that the court erred on remand in denying his motion for a new trial because Kirkman's recantation was newly discovered evidence and of such conclusive character that it would probably change the result on retrial.

¶ 46 A new trial is warranted based on newly discovered evidence where:

> "(1) it has been discovered since the trial; (2) it is of such a character that it could not have been discovered prior to the trial by the exercise of due diligence; (3) it is material to the issue but not merely cumulative; and (4) it is of such a conclusive character that it will probably change the result on retrial." *People v. Williams*, 295 Ill. App. 3d 456, 462 (1998).

We review the trial court's denial of a motion for new trial for an abuse of discretion. *Id.* The trial court can deny the motion for a new trial based upon newly discovered evidence without holding a full evidentiary hearing, provided the decision is not an abuse of discretion. *People v. Smith*, 177 Ill. 2d 53, 82 (1997)

¶ 47 Defendant contends that we should review the issue *de novo* because the judge who heard the motion for a new trial on remand did not preside over defendant's jury trial or hear testimony. Thus, defendant contends, this court is in the same position as the circuit court to evaluate Kirkman's recantation. The State responds that the trial court made both factual and legal findings, and we should review for an abuse of discretion. We need not decide this issue, however, because the result is the same under either standard of review.

¶ 48 We find the circumstances here justify granting a new trial as Kirkman's recantation was newly discovered, material to the issue, and so conclusive that it would probably change the result on retrial.

¶ 49    First, the evidence was newly discovered since trial. At trial, Kirkman testified that he observed defendant shoot Hoskins. Defense counsel cross-examined Kirkman about purportedly telling Coats that the only reason Kirkman told officers defendant shot Hoskins was that Kirkman was told to do so by "people in the neighborhood." Kirkman, however, denied telling that to Coats. After trial, Kirkman recanted his identification of defendant as the shooter, first in an affidavit and then at the first hearing on the motion for a new trial, testifying that he named defendant because people in the neighborhood threatened him. As, at trial, Kirkman specifically denied being told to name defendant as the shooter, his subsequent recantation of that testimony is newly discovered. See *Williams*, 295 Ill. App. 3d at 462.

¶ 50    The State contends that the evidence is not newly discovered because defendant was on notice at trial regarding Kirkman's recantation through Coats' testimony. The State contends that the jury heard Coats' testimony regarding Kirkman's recantation and rejected its veracity, and, although Kirkman did not provide his affidavit until after trial, his recantation is "essentially" the same as the impeachment testimony from Coats.

¶ 51    We disagree. Defendant was indeed on notice at trial that Kirkman allegedly informed Coats that he lied to the police about defendant's identity as the shooter. However, defendant cross-examined Kirkman trial regarding his alleged statements to Coats, and Kirkman denied making them. In other words, Kirkman specifically refused to recant his identification and acknowledge he lied to police. Not until he provided his affidavit in support of defendant's motion for a new trial did he recant his identification. Accordingly, defendant's due diligence could not have compelled Kirkman to testify differently at trial. Accordingly, Kirkman's posttrial recantation and testimony at the motion for a new trial was newly discovered.

¶ 52    Further, Kirkman's recantation was material to the issue of defendant's guilt and so conclusive that it could probably change the result on retrial. The State presented no physical evidence at trial linking defendant to the shooting. Although the State presented video evidence of the shooter, the record does not establish that the shooter's identity was clear from the footage. Ambrose, the only other witness who identified defendant as the shooter, recanted his identification at trial. Thus, Kirkman's trial testimony was the strongest evidence implicating defendant. Kirkman's recantation is, thus, material to the issue of defendant's guilt and so conclusive that it could likely change the result on retrial. The trial court, therefore, abused its discretion in denying defendant's motion for a new trial based on newly discovered evidence. See *Williams*, 295 Ill. App. 3d at 462.

¶ 53    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand the matter for a new trial. In doing so, we reject the State's position that the cause should be remanded for a new hearing on defendant's motion for a new trial. The record pertaining to the motion has been developed and, as explained, the court erred in denying the motion. As we are remanding for a new trial on this basis, we need not reach the remaining issues in defendant's appeal.

¶ 54    Reversed and remanded.